IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BACKSTOP SOLUTIONS GROUP, LLC, | |
| Plaintiff, | |
| v. | Case No.: 1:20-cv-07018 |
| DYNAMO SOFTWARE, INC. AND CHRISTOPHER FULLER, | Honorable Harry D. Leinenweber |
| Defendants. | |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Backstop Solutions Group, LLC ("Backstop" or "BSG"), for its First Amended Complaint against Dynamo Software, Inc. ("Dynamo") and Christopher Fuller ("Fuller") (collectively "Defendants"), states as follows:

## INTRODUCTION

1.     This is an action filed by Backstop against its former employee Fuller and his employer, Dynamo. Shortly after separating from their employment with Backstop, Fuller and former Backstop employee, Robert Goldbaum ("Goldbaum"), started working for Dynamo—a direct competitor of Backstop. In breach of the confidentiality and non-solicitation provisions contained in their employment agreements with Backstop, Fuller and Goldbaum used and disclosed Backstop's confidential, competitively valuable information that they acquired during their employment with Backstop to assist Dynamo in soliciting Backstop's prospective and existing clients. In addition, Dynamo, through its management-level employees, tortiously interfered with (a) Backstop's employment contracts with Fuller and Goldbaum, and (b) Backstop's prospective and existing client relationships.

1 of 33

USA.603753064.2/72K

## PARTIES

2.     Backstop is an Illinois limited liability company with its principal place of business in Chicago, and it is licensed and authorized to do business in, among other states, Illinois.

3.     Backstop was founded in 2003 with the goal of creating the industry's first Software-as-a-Service platform designed to help firms in the alternative and institutional investment industries simplify and streamline otherwise time-consuming tasks and processes. At all times material hereto, Backstop was and is engaged in the business of providing innovative software solutions to hedge funds, funds of funds, pensions, endowments, private equity firms, consultants, family offices, fund administrators, investment banks, and other service providers and participants in the alternative and institutional investment industries (the "Business").

4.     Dynamo is a Delaware corporation, and at all times material hereto, had its principal place of business in Watertown, Massachusetts.

5.     Upon information and belief, at all times material hereto, Dynamo's key executives worked primarily from Dynamo's principal place of business in Watertown, Massachusetts.

6.     Like Backstop, at all times material hereto, Dynamo was and is engaged in the Business, and is and has been a direct competitor of Backstop.

7.     Upon information and belief, Defendant Fuller is, and at all times material hereto was, a resident of New York.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this matter because it raises a federal question under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 *et seq*., and the Court has supplemental jurisdiction over Backstop's state law claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted herein occurred in this District.

10.     The Court has personal jurisdiction over Defendants.

11.     Dynamo has conducted and currently conducts business within the State of Illinois and the Northern District of Illinois.

12.     Goldbaum was employed by Backstop at its Chicago, Illinois office pursuant to his Employment, Confidentiality, and Non-Solicitation Agreement (the "Goldbaum Agreement"), which contains an Illinois choice-of-law provision. (A true and authentic copy of the Goldbaum Agreement is attached hereto as **Exhibit A**.) Goldbaum is no longer employed by Dynamo.

13.     Fuller was employed by Backstop at its New York, New York office pursuant to his Employment, Confidentiality, and Non-Solicitation Agreement (the "Fuller Agreement"), which contains an Illinois choice-of-law provision. (A true and authentic copy of the Fuller Agreement is attached hereto as **Exhibit B**.)

14.     Fuller traveled to Backstop's Chicago office during his tenure with Backstop on many occasions and had specific contacts with Backstop's existing and prospective clients in Chicago, Illinois and elsewhere in the State of Illinois.

15.     Defendants have purposefully and voluntarily placed Dynamo's products and services into the stream of commerce with the expectation that they will be purchased and used by clients located in the State of Illinois and the Northern District of Illinois.

## **FACTUAL ALLEGATIONS**

### Backstop's Trade Secrets, Proprietary Information, and Confidential Information

16.     Backstop's software suite is designed to meet the full spectrum of alternative and institutional investors' needs, with solutions to address the portfolio management and research

needs of asset owners to the capital raising, retention, and investor servicing requirements of asset managers (the "Backstop Suite"). More specifically, the Backstop Suite includes the following license options: (a) Client Relationship Management ("CRM"), (b) Sales and Marketing, (c) Investor Relations, (d) Research Management, and (e) Portfolio Management.

17.     The Backstop Suite's CRM functionality enables users to streamline and document records and research management, with tools for managing qualitative research information, investment interactions, documentation, and historical communication, including automatic email synchronization and the ability to create and distribute performance updates and investment newsletters to targeted prospect lists.

18.     The Backstop Suite's Sales and Marketing functionality offers access to client relationship management tools with the added ability to track and manage investor opportunities, enabling users to raise capital through opportunity and sales pipeline management tools in order to monitor and optimize the sales cycle from start to finish.

19.     The Backstop Suite's Investor Relations functionality includes the CRM functionality and Sales and Marketing functionality, as well as investor account management and communication management functionality.

20.     The Backstop Suite's Research Management functionality is tailored to research efforts, including contact and document management, fund data capture and analysis, and portfolio monitoring. The Backstop Suite's Research Management also enables users to track and monitor funds, and it provides a fully integrated due diligence process.

USA.603753064.2/72K

21.     Finally, the Backstop Suite's Portfolio Management functionality includes all of the above-described functionality, with added portfolio management capabilities such as fund analysis and analytics.

22.     Ultimately, the Backstop Suite allows Backstop's clients to manage their own client and partner activities, investments and investment documentation, research materials, and email communications in one central database. The Backstop Suite also provides a "Backstop Mobile" function to access crucial information, manage contacts, and add notes on the go; Backstop Portal to provide clients with a secure web portal to distribute sensitive information (such as research and fund performance reports) to investors and other third parties; and Backstop Accounting to provide clients with extensive investor and portfolio accounting functionality.

23.     Backstop has invested a significant portion of its revenue annually into research and development of new products and services to introduce to existing and prospective clients.

24.     Backstop's confidential and propriety trade secrets include, but are not limited to, non-public: (a) Client Information: the identities of certain of Backstop's clients and client contacts, the unique preferences and needs of Backstop's clients, the customization of the Backstop Suite's functionality to address such preferences and meet such needs, and the terms and conditions of Backstop's historical relationships with its clients, including pricing and payment terms; (b) Proof of Concept Documents: detailed proposals explaining specific products and services tailored by Backstop to a particular client or prospective client, subsequent modifications of such proposals based on client and prospective client feedback and any known competitors competing for the same business opportunities, pricing information for the specific products and services which is often scalable based on the existing or prospective client's needs and otherwise adjustable based on market strategy considerations, and a timeline for integrating Backstop's products and

services into the client or prospective client's business; (c) <u>Marketing Strategies</u>: Backstop's marketing strategies, including existing and prospective client-specific marketing strategies and related information; (d) <u>Backstop's Future Business Plans</u>: Backstop's client targets and business plans, including an internal Project Roadmap discussing Backstop's confidential business and product development plans and long-term strategic priorities (e) <u>Terms and Conditions of Backstop's Client Agreements</u>: the terms and conditions of Backstop's service agreements, including Backstop's pricing arrangements, liability caps and exclusions, representations/warranties/indemnities, and data privacy protections and offerings; (f) <u>Pricing, Sales, and Profit Margin Information</u>: Backstop's profit margins, pricing strategies, pricing practices, sales practices, and similar information; (g) <u>Software and Related Intellectual Property</u>: Backstop's data, computer coding, inventions, and intellectual property related to the software products developed by Backstop and its employees; and (h) <u>Backstop's Aggregate Business Model</u>: incorporating all of the above. The information identified in this paragraph is referred to in this Complaint as the "Confidential Information."

25.     Throughout their employment, Fuller and Goldbaum were actively involved in developing strategic business plans with Backstop's Product Development Team and Engineering Team, including meetings and communications regarding Backstop's planned future products and services, tailored to the needs of Backstop's existing and prospective clients based on Backstop's own Confidential Information and strategic growth initiatives.

26.     Backstop has spent, and continues to spend, substantial financial resources creating and compiling its Confidential Information. If misappropriated, Backstop's Confidential Information would enable a competitor to harm Backstop's business interests, and/or to use

Backstop's Confidential Information to gain an unfair competitive advantage over Backstop in competing for Backstop's existing and prospective clients.

27.     Backstop takes appropriate steps to guard its Confidential Information, including, without limitation, its practices of requiring its employees, including former employees Fuller and Goldbaum, to sign agreements that include provisions relating to non-disclosure/non-use of its Confidential Information during employment and thereafter, requiring the return of all Confidential Information upon separation from employment, and, depending on the position (including the positions held by Fuller and Goldbaum), reasonable restrictions on solicitation of Backstop's clients, prospective clients, and employees, among other provisions; including provisions in its employee handbook directing employees to maintain confidentiality with respect to Backstop's documents and information; requiring employees to attend training, including online interactive training attended by Fuller and Goldbaum, regarding the protection of confidential information, including the topics of Mobile Device Security (including proper protection of organizational data stored on cellular phones and mobile devices); Insider Threats (including how to determine whether a company employee may be stealing organizational data and/or confidential information belonging to Backstop); and Data Security and Data Destruction (including the proper storage, transmission, and destruction of secure organizational data and confidential information); establishing reasonable restrictions on employees' access to client data and/or the computer databases upon which sensitive client information is stored; password-protecting all of its computers and databases; use of a firewall network security system, multi-factor authentication, and encryption technology; limiting access to its offices to employees to whom keycards have been issued with the capability to monitor each instance of keycard use; limiting access to areas of its offices where its servers are stored; the use of on-site document shredding machines for

USA.603753064.2/72K

purposes of destroying confidential information; termination of employee access to Backstop's computer systems and servers promptly upon separation of employment; collecting Company property, including laptops, from separating employees; requiring prospective clients considering the use of Backstop's products and services to sign non-disclosure agreements before Backstop agrees to provide the prospective client with certain types of demonstrations, especially if Backstop's ongoing pursuit of the prospective client might tend to reveal any of Backstop's Confidential Information to a third party; and including the following statement on its client proposal template: "Statement of Confidentiality: This proposal and supporting materials contain confidential and proprietary business information of Backstop Solutions Group LLC. These materials may be printed or photocopied for use in evaluating the proposed project, but are not to be shared with other parties."

<u>Goldbaum's Employment with Backstop</u>
<u>and Access to Backstop's Confidential Information</u>

28. On or about February 7, 2012, Backstop hired Goldbaum as a Product Manager in its Chicago, Illinois office. He was later promoted to the position of Vice President of Product and Market Strategy, and thereafter promoted to the position of Senior Vice President of Product and Market Strategy. In this position, Goldbaum was responsible for, among other things, identifying prospective client business opportunities and packaging Backstop's products to be proposed to such clients; developing strategic relationships to better position Backstop's products within existing clients; and collaborating with the Product and Marketing Managers to initiate new projects to drive market penetration of target markets.

29. In his role, Goldbaum generated documents governing Backstop's client relationships, regularly communicated with clients, partnered with clients and third-party vendors to develop plans and strategies to serve the clients' needs, participated in presentations and sales

pitches to targeted potential clients, and developed strategies to expand Backstop's existing clientele using Backstop's Confidential Information.

30.     More specifically, Goldbaum had access to guides and confidential documents drafted and developed by Backstop using its Confidential Information, including notes and strategy memoranda regarding how to best sell and "pitch" prospective clients, including documents drafted to specifically address any known competitor pitching the same prospective client in order to distinguish Backstop's values and strengths as compared to the specific competitor (referred to as "Battle Cards"), sales territory maps, proposal templates, discounting rules, marketing overviews regarding specific vertical market groups, notes and strategy memoranda regarding how to best sell and "pitch" each vertical market group, and other competitive analysis and tools developed using Backstop's Confidential Information.

31.     On behalf of Backstop, Goldbaum also generated responses to proposals for Backstop's client prospects and was intimately involved in targeting potential and existing clients for both new business and the expansion of existing business.

32.     Goldbaum had access to and used Backstop's Confidential Information, including pricing information and trade secrets directly related to Backstop's technology and services, including, without limitation, the feedback received from clients and potential clients relating to their perceptions of the Backstop Suite's strengths and perceived weaknesses for certain applications based on the existing or potential client's often confidential future business plans.

33.     Moreover, as a Senior Vice President, Goldbaum served on Backstop's internal Product Strategy Council. The Product Strategy Council was comprised of Backstop's top executives, including its Chief Executive Officer and Product Development Manager. During Goldbaum's employment, the Product Strategy Council met regularly to discuss Backstop's

strategic initiatives and long-term business plans, including its competition in the market with Dynamo specifically. As a member of the Product Strategy Council, Defendant Goldbaum had access to and reviewed Confidential Information which other Backstop employees could not access without first requesting and receiving permission and access credentials from a member of the Product Strategy Council, including Confidential Information stored on Backstop's password-protected databases.

34.     While working for Backstop, Goldbaum exchanged substantial amounts of Confidential Information between his personal email account and his Backstop email account, including as recently as November 8, 2017, just weeks before his separation from his employment with Backstop.

<u>Fuller's Employment with Backstop and</u>
<u>Access to Backstop's Confidential Information</u>

35.     On or about October 27, 2014, Backstop hired Fuller as a Sales Executive in its New York, New York Office, and later promoted Fuller to Director of Institutional Sales. As Director of Institutional Sales, Fuller was responsible for selling Backstop's Suite in the Northeast region of the United States.

36.     In his role as Director of Institutional Sales, Fuller generated documents governing Backstop's client relationships, regularly communicated with clients, partnered with clients and third-party vendors to develop plans and strategies to serve the clients' needs, participated in presentations and sales pitches to targeted potential clients, and developed strategies to expand Backstop's existing clientele using Backstop's existing Confidential Information.

37.     More specifically, Fuller had access to guides and confidential documents drafted and developed by Backstop using its Confidential Information, sales territory maps, proposal templates, discounting rules, marketing overviews regarding specific vertical market groups, notes

and strategy memoranda regarding how to best sell and "pitch" each vertical market group, and other competitive analysis and tools developed using Backstop's Confidential Information.

38.     On behalf of Backstop, Fuller also generated responses to proposals for Backstop's client prospects and was intimately involved in targeting potential and existing clients for both new business and the expansion of existing business.

39.     Fuller had access to and used Backstop's Confidential Information, including pricing information and other trade secrets directly related to Backstop's technology and services, including, without limitation, the feedback received from existing and prospective clients relating to their perceptions of strengths and perceived weaknesses for certain applications of the Backstop Suite.

Fuller's and Goldbaum's Contractual Obligations
Under the Respective Agreements with Backstop

40.     In consideration of their salaries, incentive compensation, and other benefits of employment with Backstop, Fuller and Goldbaum voluntarily signed the Fuller Agreement and the Goldbaum Agreement, respectively. (The Fuller Agreement and the Goldbaum Agreement are collectively referred to herein as the "Restrictive Covenant Agreements") (*See* Ex. A, Ex. B.)

41.     In the Restrictive Covenant Agreements, Fuller and Goldbaum agreed, *inter alia*, not to disclose or misappropriate Backstop's trade secrets or Confidential Information:

> Except as permitted by this Agreement or with the written consent of BSG's President and Chief Executive Officer, the Employee shall not at any time during or after employment with BSG, divulge, disclose, or communicate, directly or indirectly, to any person, corporation, or other entity, or use for his/her own benefit or for the benefit of anyone other than BSG, any of BSG's trade secrets or confidential or proprietary information, including, but not limited to, Client or Potential Client identities and contacts; Client or Potential Client lists, Client or Potential Client financial, business, or personal information; Client or Potential Client goals or objectives; BSG's research, recommendations, or proposals; other information relating to Client or Potential Client accounts, feedback, or directions; financial and

11 of 33

business information relating to BSG and its transactions; and any other confidential information relating to BSG, its business, or its Clients or Potential Clients….

(Restrictive Covenant Agreements, § 6).

42.     In the Restrictive Covenant Agreements, Goldbaum and Fuller also agreed, for a period of twelve (12) months following their separations from employment from Backstop (the "Restricted Period"), not to solicit Backstop's Clients, Potential Clients, or employees:

> During the Employee's employment by BSG, and for the twelve (12)-month period following the last day of the Employee's employment by BSG, the Employee shall not solicit (or assist other persons or entities to perform services for, or solicit):
>
> > a.     Any Client for which the Employee, during the eighteen (18)-month period prior to the termination of the Employee's employment with BSG: (1) performed services directly or indirectly, (2) had any direct or indirect responsibility, or (3) had knowledge, directly or indirectly, of services performed by BSG: or
> >
> > b.     Any person or entity that was a Potential Client of BSG at any time during the eighteen (18)-month period prior to the termination of the Employee's employment if the Employee had any direct or indirect responsibility for, or participated directly or indirectly in, any meetings or communications with, or the preparation or presentation of any proposals to that Potential Client.

(Restrictive Covenant Agreements, § 8).

43.     The Restrictive Covenant Agreements define "Client" as "[a]ny person, corporation, or other entity which has entered into a business relationship by way of contract with Backstop or to which Backstop has provided any services, and "Potential Client" as "[a]ny person, corporation, or other entity with which any agent or employee of Backstop has had communications regarding the possibility of purchasing any products from Backstop or receiving services from Backstop." (Restrictive Covenant Agreements, § 5).

44.     These covenants advance Backstop's legitimate business interests, in that they ensure employees with access to Backstop's Confidential Information, including trade secrets,

cannot use such information to provide an unfair competitive advantage to Backstop's competitors (such as Dynamo) after the employee's employment ends.

45.     The Restrictive Covenant Agreements also provide for the tolling of the Restricted Period in the event of a breach: "In the event of any breach or violation of the restrictions contained in Paragraphs 6 through 9 of this Agreement, the specified period for observance of those restrictions shall abate during the time of any such breach or violation, and such time period remaining at the time of the breach shall not begin to run again until the breach has been fully and finally cured." (Restrictive Covenant Agreements, § 11).

46.     Goldbaum separated from his employment with Backstop, effective November 27, 2017, and Fuller separated from his employment with Backstop, effective December 18, 2017.

47.     The Restrictive Covenant Agreements' Restricted Periods (with respect to the non-solicitation covenants) would have expired in late 2018. However, in light of the breaches of the Restrictive Covenant Agreements described herein, and subject to Section 11 of the Restrictive Covenant Agreements, Goldbaum and Fuller continued to be bound by the provisions to which the Restricted Periods refer for the duration of such breaches. In addition, irrespective of the breaches described herein, Goldbaum and Fuller continue to be bound by the provisions of the Restrictive Covenant Agreements prohibiting the use and disclosure of Backstop's Confidential Information.

Backstop's Creation and Pursuit of
█████████████████████ Business Opportunity

48.     During their employment with Backstop, Fuller led, and Goldbaum had direct involvement in, Backstop's strategic plans to create and pursue a significant and confidential business opportunity with ███, with whom it had entered into a Mutual Non-Disclosure Agreement. This opportunity will be referred to herein as the "███ Opportunity."

49. █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

50. █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

51.     Backstop took reasonable steps to ensure that the ██ Opportunity and Confidential Information related thereto, including strategy, pricing information, research, and the Proof of Concept completed with ██ remained secret and not available outside of Backstop, except to those employees of ██ and ██ who were involved in the ██ Opportunity.

52.     During his employment with Backstop, Fuller communicated regularly with, among other contacts at ████████████████████████ (the "Key ██ Executive"), and discussed ████████████████████████████

████████████████████████████████

████████████████

53.     ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████

54.     Goldbaum also was involved in Backstop's pursuit of the ██ Opportunity, participating in important internal and client-facing meetings. ████████████████

████████████████████████████████

USA.603753064.2/72K



55. Accordingly, ███ was a Potential Client of Backstop within the meaning of the Restrictive Covenant Agreements.

56. Upon information and belief, at the time of Goldbaum's November 27, 2017 separation from his employment with Backstop, no other competitors of Backstop were aware of the ███ Opportunity (including Dynamo), which Backstop created through significant expense and extensive communications with ███ regarding ███ specific needs, and Backstop's ability to partner with ███ to meet ███ needs in a cost-effective manner.

<u>Fuller's Wrongful Disclosure of the ███ Opportunity</u>
<u>to Dynamo and Dynamo's Tortious Interference</u>
<u>with the Restrictive Covenant Agreements</u>

57. Upon information and belief, Dynamo hired Goldbaum and Fuller in or around January 2018.

58. At the time of Goldbaum's and Fuller's hire, Momchil Barros-Mitov ("Barros-Mitov") was Dynamo's Director of Data Services. Like Goldbaum and Fuller, Barros-Mitov was a former high-level sales executive of Backstop, having held the position of Vice President, Institutional Sales with Backstop from January 2014 through April 2016.

USA.603753064.2/72K

59. Upon information and belief, at all times material hereto, Barros-Mitov and other of Dynamo's key executives worked primarily from Dynamo's principal place of business in Watertown, Massachusetts.

60. As a former Backstop sales executive, Barros-Mitov was aware that it was Backstop's practice to have its employees sign employment agreements containing post-employment restrictive covenants similar to those contained in the Restrictive Covenant Agreements.

61. In fact, Barros-Mitov had himself signed a restrictive covenant agreement with Backstop prohibiting the use and disclosure of Backstop's Confidential Information and containing post-employment client/employee non-solicitation provisions.

62. While working for Backstop as its Vice President, Institutional Sales, Barros-Mitov also recruited and supervised Backstop sales employees with the same or similar employment agreements as his Backstop employment agreement and the Restrictive Covenant Agreements.

63. Prior to Dynamo's hiring of Fuller and Goldbaum, Barros-Mitov worked with another former employee of Backstop to develop a strategy for pursing existing and/or prospective clients of Backstop, which he referred to internally at Dynamo as the "Backstop hit list" or similar term.

64. Within six weeks of Fuller's separation from employment with Backstop, Fuller disclosed to Barros-Mitov the ███ Opportunity.

65. Within six weeks of Fuller's separation from employment with Backstop, Fuller also disclosed to Barros-Mitov that Backstop was pursuing the ███ Opportunity in partnership with ███.

66.     On internal Dynamo group sales calls, Fuller also identified other non-public existing and/or prospective clients of Backstop and the identities of his key contacts at such non-public existing and/or prospective clients, the vast majority of whom he developed during his tenure with Backstop.

67.     Shortly after Fuller's separation from employment with Backstop, Fuller had an in-person meeting with the Key ███ Executive. Upon information and belief, the meeting topics included the ███ Opportunity.

68.     Thereafter, Barros-Mitov and Dynamo pursued the ███ Opportunity and began competing head-to-head with Backstop for the ███ Opportunity.

69.     Upon information and belief, Fuller encouraged the Key ███ Executive to pursue a relationship with Dynamo in connection with the ███ Opportunity and/or discouraged the Key ███ Executive from continuing to pursue a relationship with Backstop relating to the ███ Opportunity.

70.     Upon information and belief, Fuller and Goldbaum, with Dynamo's knowledge, used and/or disclosed to Dynamo employees Backstop's trade secrets and Confidential Information, ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████ and/or how Dynamo might use such information to gain an unfair competitive advantage over Backstop with respect to the ███ Opportunity.

71.     Upon information and belief, Dynamo used Backstop's trade secrets and Confidential Information to provide Dynamo with an unfair competitive advantage over Backstop, which negatively impacted Backstop's unique competitive positon as the only vendor pursuing the

██ Opportunity, ultimately resulting in ██ not entering into a business relationship with Backstop with respect to the ██ Opportunity and significantly damaging Backstop's then-existing relationship with ██.

72. Upon information and belief, Barros-Mitov induced and/or encouraged Fuller and Goldbaum to violate their Restrictive Covenant Agreements through the above-described actions concerning the ██ Opportunity.



73. Goldbaum was directly involved in Backstop's strategic partnership with ██ a leading developer of quantitative and investment analytics software marketed and sold to large financial institutions.

74. Fuller also had direct involvement in the ██ strategic partnership, including regular communications by email and other means with ██ Chief Executive Officer (the ██ Key Executive"). Among other things, Fuller and the ██ Key Executive communicated regarding unique business opportunities which ██ and Backstop could jointly pursue; the needs of existing and prospective clients of both ██ and Backstop; and ways in which ██ and Backstop could integrate their separate and complimentary software and technology to generate new business.

75. Fuller and Goldbaum had extensive knowledge of the confidential terms and conditions of the ██ strategic partnership, and other confidential and competitively valuable information concerning the specifics of the strategic plans of Backstop and ██ to jointly generate new business through this partnership, some or all of which constitute Confidential Information within the meaning of the Restrictive Covenant Agreements.

19 of 33

76.     ███ was an existing Backstop client in 2017, and Fuller had access to ███ confidential information, as well as access to Backstop's Confidential Information relating to ███. As such, Fuller was prohibited from, *inter alia*, soliciting or assisting others in soliciting ███ during the Restricted Period.

77.     During 2017, Goldbaum and Fuller were directly involved in Backstop's efforts to expand its existing relationship with ███ regarding a specific opportunity (the "███ Opportunity").

78.     ████████████████████████████████████████████████████████ ███████

79.     On November 11, 2017, Fuller sent an email to Goldbaum, Backstop's Chief Executive Officer, and three other members of Backstop management relaying his recent communication with a key ███ executive (the "Key ███ Executive") concerning highly confidential information about the ███ Opportunity, including ████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████

80.     After joining Dynamo, in March 2018 (i.e., during the Restricted Period), Fuller contacted the Key ███ Executive via email and had a follow-up telephone conference with the Key ███ Executive within a few days thereafter, during which Fuller discussed with the Key ███ Executive Dynamo's interest in a potential partnership with ███ to pursue a business relationship with ███, an existing Backstop client.

USA.603753064.2/72K

81.     Upon information and belief, Fuller and Goldbaum used and/or disclosed to Dynamo employees Backstop's trade secrets and other Confidential Information, including ██

████████████████████████████████████████████████████

████████████████████

82.     Upon information and belief, Fuller and Goldbaum also solicited, or assisted other Dynamo employees in soliciting, ████

83.     Backstop was not awarded the ██ Opportunity.

84.     ██ was a Potential Client within the meaning of the Goldbaum Agreement. Specifically, Goldbaum met with a Director of ██ one month prior to his separation from his employment with Backstop. Following that meeting, Goldbaum identified ██ as a potential client to Backstop's Vice President of Enterprise Sales, Charlie Beckett.

85.     As such, Goldbaum was prohibited from, *inter alia*, soliciting or assisting others in soliciting ██ during the Restricted Period.

86.     Upon information and belief, during the Restricted Period, Goldbaum, with Dynamo's knowledge, used and/or disclosed to Dynamo employees Backstop's trade secrets and Confidential Information relating to ██ and solicited, or assisted other Dynamo employees in soliciting, ██. This belief is based, in part, on an email exchange between and among Goldbaum, the Key ██ Executive, Barros-Mitov, and Dynamo's Institutional Sales Manager, Brendan Burke, concerning their pursuit of the same business opportunity with ██ that Backstop was pursuing (the "██ Opportunity"), in partnership with ██ The Key ██ Executive had inadvertently forwarded this email chain to Goldbaum's former Backstop email address. (True and correct copies of these emails are attached hereto as **<u>Exhibit C</u>**.)

87.     Backstop was not awarded the ██ Opportunity.

## COUNT I
## BREACH OF CONTRACT (DEFENDANT FULLER)

88.     Backstop re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

89.     The Fuller Agreement is a valid, binding contract, supported by adequate consideration, and is in full force and effect.

90.     Backstop performed all of its duties and obligations under the Fuller Agreement.

91.     Notwithstanding Backstop's performance of its duties and obligations, Fuller breached the Fuller Agreement by soliciting and/or assisting others in soliciting ▆ and ▆ during the Restricted Period on behalf of Dynamo, a direct competitor of Backstop.

92.     Fuller breached the Agreement by divulging, disclosing, and/or communicating, directly or indirectly, to Dynamo and other persons Backstop's Confidential Information, including the information related to the business opportunities identified herein.

93.     Fuller's breaches of his Agreement have directly and proximately resulted in damages to Backstop.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS
## UNDER 18 U.S.C. § 1836 (BOTH DEFENDANTS)

94.     Backstop re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

95.     Backstop is the owner of the above-described valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce, including, without limitation, the highly confidential and competitively valuable information relating to the ▆ Opportunity and the ▆ Opportunity.

96. Backstop's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

97. Backstop has taken the above-described reasonable measures to keep such information secret.

98. Backstop did not give Defendants express or implied permission to discuss, divulge, or use for competitive purposes any of Backstop's trade secrets.

99. Upon information and belief, Defendants misappropriated Backstop's trade secrets for the purpose of targeting Backstop's existing and prospective clients and to compete unfairly in the marketplace, capitalizing on Backstop's investment of time, resources, and goodwill.

100. Defendants' misappropriation of Backstop's trade secrets was knowing, willful, and malicious. Barros-Mitov was aware at the time of the disclosure and/or use of Backstop's trade secrets that Goldbaum and Fuller were contractually restricted from using or disclosing Backstop's trade secret information.

101. Accordingly, Dynamo knew or had reason to know at the time of the disclosure and use that the knowledge of Backstop's trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets, including, without limitation, through Barros-Mitov's knowledge of the restrictions in the Restrictive Covenant Agreements.

102. As a result of Defendants' misappropriation of Backstop's trade secrets, Backstop has suffered harm in the form of, *inter alia*, actual misappropriation of Backstop's trade secrets, injury and harm to its goodwill and business reputation, and loss of confidence and trust among its clients.

USA.603753064.2/72K

103.    Backstop is entitled to an award of all actual direct and consequential damages sustained as a result of Defendants' misappropriation, exemplary damages under 18 U.S.C. § 1836(b)(3)(B), and an award of Backstop's reasonable attorneys' fees in bringing this action.

## COUNT III
### MISAPPROPRIATION OF TRADE SECRETS UNDER
### MASS. GEN. LAWS CH. 93, §§ 42 AND 42A (BOTH DEFENDANTS)

104.    Backstop re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

105.    Defendants' above-described conduct violates Mass. Gen. L. Ch. 93 §§ 42, 42A.

106.    Backstop is and was the owner of the above-described trade secret information, tangible and intangible and electronically kept or stored, that constitutes, represents, evidences, and/or records a secret scientific, technical, merchandising production or management information, design, process, procedure, formula, invention, and/or improvement.

107.    Backstop's information described herein constitutes valuable trade secrets related to products and services, including, without limitation, the highly confidential and competitively valuable information relating to the ▮ Opportunity and the ▮ Opportunity.

108.    Backstop's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

109.    Backstop took the above-described reasonable steps to preserve the secrecy and confidentiality of the information.

110.    Defendants knew or had reason to know that such trade secrets are confidential and proprietary to Backstop. However, despite such knowledge, upon information and belief,

Defendants improperly used for themselves and/or disclosed to third parties such trade secrets without Backstop's express or implied consent.

111. Upon information and belief, Defendants used improper means, including breaching and/or inducing the breach of the Restrictive Covenant Agreements, to acquire and use Backstop's trade secrets to Defendants' advantage and to Backstop's detriment.

112. As a result of Defendants' misappropriation of Backstop's trade secrets, Backstop has suffered harm in the form of, *inter alia*, actual misappropriation of Backstop's trade secrets, injury and harm to its goodwill and business reputation, and loss of confidence and trust among its clients.

113. Defendants' misappropriation of Plaintiff's trade secrets was knowing, willful and malicious, and undertaken to inflict damage on Plaintiff's business operations.

114. Backstop is entitled to an award of all actual direct and consequential damages sustained as a result of Defendants' misappropriation, and exemplary damages pursuant to Mass. Gen. Laws Ch. 93, §§ 42, 42A.

## COUNT IV
## MISAPPROPRIATION OF TRADE SECRETS UNDER
## MASSACHUSETTS COMMON LAW (BOTH DEFENDANTS)

115. Backstop re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

116. Backstop is the owner of the above-described valuable trade secrets related to products and services, including, without limitation, the highly confidential and competitively valuable information relating to the ███ Opportunity and the ███ Opportunity.

117. Backstop's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

118. Backstop took the above-described reasonable steps to preserve the secrecy and confidentiality of the information.

119. By virtue of their employment and responsibilities, Fuller and Goldbaum were given access to trade secrets and other confidential and proprietary information.

120. Fuller and Goldbaum had and have a continuing duty to maintain the confidentiality of the trade secrets and other confidential information provided to them through the course of their employment with Backstop, as well as a continuing duty to not use, exploit, divulge, or publish such information except in connection with the performance of their duties for Backstop, and with Backstop's authorization.

121. Defendants knew or had reason to know that such trade secrets are confidential and proprietary to Backstop. However, despite such knowledge, upon information and belief, Defendants improperly used for themselves and/or disclosed to third parties such trade secrets without Backstop's express or implied consent.

122. The conduct described herein establishes that Defendants misappropriated, disclosed, misused, took, exploited, and/or otherwise used Backstop's trade secrets and/or confidential and proprietary information to benefit themselves, and to the detriment of Backstop.

123. Alternatively, Defendants wrongfully took Backstop's trade secrets and intended to convert those trade secrets to their own use at Dynamo, for their own benefit and to the detriment of Backstop.

124.     As a result of Defendants' misappropriation of Backstop's trade secrets, Backstop has suffered harm in the form of, *inter alia*, actual misappropriation of Backstop's trade secrets, injury and harm to its goodwill and business reputation, and loss of confidence and trust among its clients.

125.     Defendants' misappropriation of Plaintiff's trade secrets was knowing, willful and malicious, and undertaken to inflict damage on Plaintiff's business operations.

126.     Backstop is entitled to an award of all actual direct and consequential damages sustained as a result of Defendants' misappropriation.

**COUNT V**
**UNFAIR AND DECEPTIVE TRADE PRACTICES IN VIOLATION OF**
**MASS. GEN. LAWS CH. 93A, § 11 (BOTH DEFENDANTS)**

127.     Backstop re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

128.     Backstop, Dynamo, and Fuller are engaged in trade and commerce.

129.     Dynamo is a direct competitor of Backstop in the marketplace, in that Dynamo provides similar "Software-as-a-Service" products and services to firms in the alternative and institutional investment industries.

130.     Fuller competes against Backstop in the marketplace because, as an employee, Fuller is providing and/or soliciting to provide similar "Software-as-a-Service" products and services to firms in the alternative and institutional investment industries.

131.     Dynamo and Fuller committed unfair and deceptive acts toward Backstop by misappropriating trade secrets, including, without limitation, the highly confidential and competitively valuable information relating to the ███ Opportunity and the ███ Opportunity.

132.    Dynamo and Fuller committed unfair and deceptive acts toward Backstop by tortiously and maliciously interfering with Backstop's legitimate business expectancies with certain clients and/or potential clients, including, without limitation, ██ and ██.

133.    Dynamo committed unfair and deceptive acts toward Backstop by tortiously interfering with Backstop's employment agreements with Fuller and Goldbaum.

134.    Defendants' unfair and deceptive practices occurred primarily and substantially within Massachusetts because, upon information and belief, among other things: Barros-Mitov and other of Dynamo's key executives directed the unfair and deceptive practices described herein from Dynamo's principal place of business in Watertown, Massachusetts; and Fuller and Goldbaum revealed the highly confidential and competitively valuable information relating to the ██ Opportunity and the ██ Opportunity to Dynamo executives in Massachusetts.

135.    Defendants' wrongful conduct harms the open marketplace.

136.    As a direct and proximate result of Fuller's and Dynamo's unfair and deceptive business practices, Backstop has suffered harm and is entitled to all damages authorized by Mass. Gen. Laws Ch. 93A, § 11.

## COUNT VI
## MISAPPROPRIATION OF TRADE SECRETS
## UNDER 765 ILCS 1065/1 (BOTH DEFENDANTS)

137.    Backstop re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

138.    Backstop has alleged that Defendants' conduct violates Massachusetts law. If, however, Illinois rather than Massachusetts law were to apply to Backstop's trade secret misappropriation claims, then Defendants' conduct violates the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*. ("ITSA").

139.     Backstop owns valuable trade secrets that were disclosed to Fuller and Goldbaum in the course of their employment with Backstop.

140.     Such information constitutes trade secrets pursuant to the provisions of the ITSA.

141.     Defendants knew or had reason to know that such trade secrets are confidential and proprietary to Backstop. However, despite such knowledge, upon information and belief, Defendants improperly used for themselves and/or disclosed to third parties such trade secrets without Backstop's express or implied consent.

142.     As a result of Defendants' misappropriation of trade secrets, Backstop has been damaged in an amount to be determined at trial.

143.     Defendants' misappropriation of Backstop's trade secrets was both willful and malicious, and undertaken to inflict damage on Plaintiff's business operations.

144.     Backstop is entitled to an award of all actual direct and consequential damages sustained as a result of Defendants' misappropriation, punitive damages for Defendants' willful and malicious misappropriation, and an award of Backstop's reasonable attorneys' fees in bringing this action.

## COUNT VII
## TORTIOUS INTERFERENCE WITH CONTRACT (DEFENDANT DYNAMO)

145.     Backstop re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

146.     Fuller and Goldbaum were each party to a valid contract with Backstop, specifically the Restrictive Covenant Agreements.

147.     Defendant Dynamo was and remains aware of Fuller's and Goldbaum's continuing contractual obligations to Backstop under the Restrictive Covenant Agreements.

148.    In spite of the above, upon information and belief, Dynamo intentionally interfered with Backstop's contractual relations with Fuller and Goldbaum, including, without limitation, through its executive, Barros-Mitov, intentionally inducing each to breach, *inter alia*, his respective client and potential client non-solicitation obligations for an improper purpose and by improper methods.

149.    Dynamo's misconduct in this regard was wanton, willful, intentional, and in reckless disregard of Backstop's rights.

150.    Backstop has been damaged as a result of Dynamo's tortious interference with its contractual relations with Fuller and Goldbaum.

151.    Backstop is entitled to an award of all actual direct and consequential damages sustained as a result of Dynamo's tortious interference with its contractual relations with Fuller and Goldbaum, and punitive damages for Dynamo's willful and malicious conduct.

## COUNT VIII
## TORTIOUS INTERFERENCE WITH
## BUSINESS EXPECTANCY (BOTH DEFENDANTS)

152.    Backstop re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

153.    Backstop and its third-party partners spent considerable time, effort, and resources to develop a working relationship with several major potential clients, including ████.

154.    In or around late 2017 and early 2018, Backstop had developed a Proof of Concept for ████, carefully and specifically demonstrating for ████ the ways in which Backstop's products and services could address ████ unique needs.

155.    Backstop received substantial positive feedback from the Key ██ Executive regarding Backstop's Proof of Concept, and Backstop reasonably believed that it would be awarded the ██ business.

156.    In or around early 2018, Defendants knew that Backstop, in partnership with ██, had made substantial progress in soliciting ██ business, and that Backstop likely would be awarded ██ business if they did not interfere.

157.    Defendants purposefully and maliciously interfered with Backstop's legitimate business expectancy and/or induced the breach of the non-solicitation provisions of the Restrictive Covenant Agreements.

158.    Backstop has been damaged by Defendants' interference in Backstop's efforts.

159.    Backstop is entitled to an award of all actual direct and consequential damages sustained as a result of Defendants' tortious interference with its legitimate business expectancies, and punitive damages for Defendants' willful and malicious conduct.

## PRAYER FOR RELIEF

WHEREFORE, Backstop prays for relief as follows:

a.    A judgment that Defendant Fuller breached the Fuller Agreement.

b.    A judgment awarding Backstop damages as a result of Fuller's breach of the Fuller Agreement, together with interest and costs.

c.    Damages assessed against Defendants pursuant to the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 *et seq*, including, but not limited to, all actual direct and consequential damages sustained as a result of Defendants' misappropriation, exemplary damages under 18 U.S.C. § 1836(b)(3)(B), for Defendants' willful and malicious misconduct, and an award of Backstop's reasonable attorneys' fees in bringing this action.

USA.603753064.2/72K

d.     Damages resulting from the misappropriation of trade secrets claim, including, but not limited to, compensatory damages, unjust enrichment or restitution damages, and/or reasonable royalty damages, as well as double Backstop's actual damages for Defendants' willful and knowing violations of Mass. Gen. Laws Ch. 93, §§ 42, 42A.

e.     Damages resulting from Defendants' unfair competition and/or unfair or deceptive acts or practices against Backstop, including an award of Backstop's reasonable attorneys' fees in bringing this action, and double or treble damages as appropriate for Defendants' willful and knowing violations of Mass. Gen. Laws. Ch. 93A.

f.     In the alternative, if Illinois law governs the misappropriation of trade secrets claim, damages under the ITSA, including compensatory damages, unjust enrichment or restitution damages, and/or reasonable royalty damages, exemplary damages for Defendant's willful and malicious misconduct, and Backstop's reasonable attorneys' fees in bringing this action.

g.     All damages available under common law as a result of Defendants' above-described tortious interference, including punitive damages.

h.     An Order that Defendants certify to the Court that they have destroyed all documents and things that include or embody Backstop's trade secrets and other intellectual property, including but not limited to client and potential client information derived from Backstop's trade secrets and/or confidential information.

i.     Expenses and costs incurred by Backstop in bringing this action.

j.     Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff Backstop demands a trial by jury on all issues in this action.

Dated: July 13, 2021

Respectfully submitted,

/s/ William J. Wortel
One of the Attorneys for Plaintiff,
Backstop Solutions Group, LLC

William J. Wortel
Brian A. Sher
Patrick M. DePoy
Melissa Whigham
BRYAN CAVE LEIGHTON PAISNER LLP
161 North Clark Street
Suite 4300
Chicago, Illinois 60601
(312) 602-5000
(312) 602-5050 (facsimile)
bill.wortel@bclplaw.com
brian.sher@bclplaw.com
patrick.depoy@bclplaw.com
mel.whigham@bclplaw.com

USA.603753064.2/72K